# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10654

United States Court of Appeals
Fifth Circuit

**FILED**

April 22, 2016

Lyle W. Cayce
Clerk

DANIEL HUX,

Plaintiff–Appellant,

versus

SOUTHERN METHODIST UNIVERSITY,
   a Texas Not-for-Profit Corporation;
RICHARD A. SHAFER, SMU Police Chief; LISA WEBB; STEVE LOGAN,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, SMITH, and HIGGINSON, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Daniel Hux, a former student at Southern Methodist University ("SMU"), appeals the Federal Rule of Civil Procedure 12(b)(6) dismissal of his Texas tort claim for alleged breach of the duty of good faith and fair dealing. Because Texas law does not impose a duty of good faith and fair dealing in the student-university relationship, we affirm.

No. 15-10654

I.

Hux was an undergraduate student and community advisor ("CA")[1] at SMU during the 2010–2011 academic year.[2] His troubles began in 2011, when he had a series of encounters with SMU staff members and an SMU student that eventually resulted in his dismissal as a CA.

In January 2011, Stephanie Howeth (a full-time SMU staff member who lived on campus and supervised some of the CAs) requested that Hux meet with her in person to discuss "student/staff relationships" and "clear up some boundaries." During their meeting, Howeth explained that three interactions with Hux had left her with the impression that he was making romantic overtures to her that had made her feel uncomfortable. Hux replied that Howeth had misinterpreted his actions. "Being careful not to hurt her feelings," Hux "carefully explained to Howeth that he had no interest in her whatsoever." Hux apologized and thought the matter resolved. Howeth, though, had already informed her supervisors of the conduct and the planned meeting.

The next day, Dorothea Mack (Howeth's supervisor) requested that Hux meet with her. At this meeting, Mack indicated that she was not recommending Hux for reappointment to his CA position the next year, because "Howeth was uncomfortable with Hux and . . . he was in denial about his very troubling [] remarks to Howeth." Hux had several additional meetings, regarding his conduct, with Mack and Mack's supervisor, Adrienne Patmythes, the Assistant Director for Training and Development in the SMU housing department, in January and into February 2011. The meetings sometimes became heated. In

---

[1] "Community advisor" appears to be SMU's local name for a resident advisor—a student hired to supervise a dormitory.

[2] Reviewing this Rule 12(b)(6) dismissal, we assume Hux's factual allegations are true. Our recitation of the facts is drawn from Hux's complaint and the district court's construction of the factual allegations in the complaint and the documents incorporated by reference.

2

addition to those tangles with the administration, Hux had a run-in with another student—a fellow CA—"about a trash problem[.]" Administrators accused Hux of speaking aggressively and inappropriately in the course of a phone conversation with his colleague regarding the situation.

Things came to a head on February 10. Mack fired Hux from his CA position, effectively immediately; Mack cited Hux's "inappropriate behavior and comments" and referred to the incidents with Howeth and the trash incident with the other CA. Hux appealed his termination to Steve Logan, SMU's Executive Director of Resident Life and Student Housing. Before his hearing on the appeal, Hux met with Betty McHone, an Assistant Chaplain at SMU, to go over the events that led to his termination. On February 18, Hux met in person with Logan to discuss his appeal; also present were three SMU police officers, including Chief Richard Shafer. The attendees discussed Hux's behavior and SMU's concerns. Shafer told Hux that he needed to visit with a doctor to prove that he was not crazy. At the end of the meeting, Shafer escorted Hux to SMU's mental health facility for an evaluation; Hux left, however, without being evaluated.

Logan denied Hux's appeal by a letter dated February 21 that indicated that Hux had made certain staff members fear for their safety. Though Hux was allowed to remain enrolled as a student, he was prohibited from contacting those involved in the incidents and was told to stay away from certain dormitories. In the course of the next week, Hux met with Dean of Student Life Lisa Webb and Assistance Vice President of Student Affairs Troy Behrens; both discussed Hux's behavior and asked what they could do to help. Hux also met with unidentified persons from the Chaplain's office during the next month.

On March 20, Hux attended a meeting for students interested in student government positions. That meeting was held in a dormitory that Hux, under

the terms of the letter from Steve Logan terminating his CA employment, was under orders to avoid. After the meeting, several SMU police officers approached Hux, told him there was a protective order prohibiting him from being at the building, and searched Hux's person. One of Hux's relatives was waiting in a car to pick him up; officers also searched the car and found a handgun. The officers handcuffed Hux and put him into a police car. Twenty-five minutes later, they removed the handcuffs, returned the gun, and instructed Hux not to bring the gun to school or have it in his car. Hux left campus.

The next day, two officers met Hux outside one of his classes and drove him to the SMU police department. There, Shafer and Webb told him that he was being placed on a mandatory administrative withdrawal from the university, citing his "continued inappropriate behavior and attempts to intimidate and threaten [housing department staff] members." Hux was given a letter memorializing the conversation. After Hux was forced to withdraw from the university, Shafer stated in an interview that Hux was no longer a student and indicated that Hux had violated university policy. Further, SMU administrators circulated a picture of Hux coupled with a notice that community members should be on the lookout for him.

## II.

Hux sued, alleging about nineteen causes of action. The district court granted the defendants' Rule 12(b)(6) motion to dismiss on most of the claims and granted summary judgment for defendants on the rest of the claims after discovery. The only claim in issue on this appeal—the notion that SMU breached a duty of good faith and fair dealing—was among those dismissed before discovery for failure to state a claim. Analyzing Texas law, the court explained that Hux had not alleged facts that, taken as true, would give rise

No. 15-10654

to the type of special relationship that creates a duty of good faith and fair dealing under Texas law. We agree and therefore affirm.

## III.

We review a Rule 12(b)(6) dismissal *de novo*, "accepting all well-pleaded facts as true and viewing these facts in the light most favorable to the plaintiff."[3] Under Texas law, the question whether there is a tort duty of good faith and fair dealing in a particular circumstance is initially a question of law.[4] The court first must decide whether the plaintiff has alleged facts that, if taken as true, would show that a special relationship even existed. Only when such a relationship could in principle exist on the facts alleged does proof of the special relationship become a question of fact.

## IV.

In applying Texas law, we look first to the decisions of the Texas Supreme Court. *See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000). If that court has not ruled on the issue, we make an *Erie*[5] guess, predicting what it would do if faced with the facts before us. *Id.* Typically, we treat state intermediate courts' decisions as the strongest indicator of what a state supreme court would do, absent a compelling reason to believe that the state supreme court would reject the lower courts' reasoning. *Id.*

Texas law does not impose a generalized contractual duty of good faith and fair dealing and, in fact, rejects it in almost all circumstances. *See English*

---

[3] *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013) (quoting *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)) (internal quotation marks omitted).

[4] *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992), *superseded by statute on other grounds as noted in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002); *Cole v. Hall*, 864 S.W.2d 563, 568 (Tex. App.—Dallas 1993, writ dism'd w.o.j.).

[5] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

*v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983).  But in an extremely narrow class of cases, the Texas courts have determined that a special relationship may give rise to a tort duty of good faith and fair dealing.  *See Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).

A duty of good faith and fair dealing may arise in two contexts.  The first, not pertinent here, is when the parties are in a formal fiduciary relationship (*e.g.*, principal-agent, attorney-client, or trustee-beneficiary); in such situations, the ordinary bundle of duties incumbent on a fiduciary includes a duty of good faith and fair dealing.  *See Crim Truck*, 823 S.W.2d at 593–94 (Tex. 1992).  The second context, relevant here, is when the parties are not formal fiduciaries but are nonetheless in a special or confidential relationship.  *Id.*  If they are, Texas law imposes a duty of good faith and fair dealing (but not the whole bundle of associated fiduciary duties).  *Id.* at 594.

Texas courts usually describe this special relationship in broad terms. The duty arises in "discrete, special relationships, earmarked by specific characteristics including: long standing relations, an imbalance of bargaining power, and significant trust and confidence shared by the parties."  *Caton v. Leach Corp.*, 896 F.2d 939, 948 (5th Cir. 1990).  The relationship must exist before and apart from the contract or agreement that forms the basis of the controversy.  *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995).  A party's unilateral, subjective sense of trust and confidence in the opposing party is not sufficient to give rise to a special relationship and the attendant duty.  *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). Because the Texas Supreme Court has not specifically addressed the special-relationship doctrine in the student-university context, we turn to the decisions of the intermediate courts.

The Texas Courts of Appeals have restricted the special-relationship

doctrine to narrow and carefully circumscribed situations. Indeed, those courts recognize only one special relationship—that between an insurer and an insured.[6] Texas courts have refused to impose a tort duty of good faith and fair dealing on any of the following relationships: employer-employee,[7] lender-borrower,[8] medical provider-patient,[9] mortgagor-mortgagee,[10] supplier-distributor,[11] franchisor-franchisee,[12] creditor-guarantor,[13] issuer and beneficiary of a letter of credit,[14] or insurance company-third-party claimant.[15]

An ordinary student-professor relationship is no different. The only Texas court that appears to have considered the question found that there was no special relationship there. *See Ho v. Univ. of Tex. at Arlington*, 984 S.W.2d 672, 693 (Tex. App.—Amarillo 1998, pet. denied). Hux does not cite a single

---

[6] *See GTE Mobilnet of S. Texas Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 295 (Tex. App.—Houston [1st Dist.] 1997, writ denied) ("Although often urged to do so, the supreme court has hesitated to extend the duty of good faith and fair dealing to other contexts beyond the special relationship between an insurance company and its insured." (quoting *Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 52 (Tex. App.—Houston [1st Dist.] 1993, no writ)); *Georgetown Associates, Ltd. v. Home Fed. Sav. & Loan Ass'n*, 795 S.W.2d 252, 255 (Tex. App.—Houston [14th Dist.] 1990, writ dism'd w.o.j.) ("It is far from clear that the so-called duty of good faith even exists. The supreme court has expressly disavowed the duty as a general matter, with an exception for a 'special relationship' between insurers and their insureds."). The Texas courts recognized a second special relationship—in the tightly analogous case of a compensation carrier and a workers' compensation claimant—from 1988 until 2012, when the Texas Supreme Court reversed course. *See Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 447–49 (Tex. 2012) (overruling *Aranda v. Ins. Co. of N. Am.*, 748 S.W.2d 210 (Tex. 1988)).

[7] *See Wheeler*, 866 S.W.2d at 52 (collecting cases).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *GTE Mobilnet*, 955 S.W.2d at 295.

[14] *Id.*

[15] *Id.*

No. 15-10654

case in which a Texas court has extended the special-relationship doctrine to any relationship save for that of an insured party and its insurer, and we are not otherwise aware of any such decision.[16]

## V.

Hux points to three core allegations that, taken as true, would, in his view, show the existence of a special relationship. First, he notes that SMU officials encouraged him to obtain mental-health services and that Shafer

---

[16] One Texas Supreme Court justice's separate concurring opinion claimed that that court has imposed a duty of good faith and fair dealing in a number of special relationships outside of the insurance context. *See English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983) (Spears, J., concurring). That concurrence, however, does not correctly state current Texas law or even Texas law in the past.

It is not accurate to say that the relationships that the opinion points to—partnership, agency, joint venture, and certain oil and gas relationships—are examples of informal special relationships giving rise to a quasi-fiduciary duty of good faith and fair dealing enforceable in tort. Partners, joint venturers, and agents are all just ordinary formal fiduciaries. *See Fitz-Gerald v. Hull*, 237 S.W.2d 256, 264–65 (Tex. 1951) (stating that partners and joint venturers are fiduciaries); *Davis-Lynch, Inc. v. Asgard Techs., LLC*, 472 S.W.3d 50, 60 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (stating that agents are fiduciaries).

This is not, therefore, evidence of a non-insurance special relationship. And, although the holder of executive rights in a mineral property owes a duty of good faith and fair dealing to holders of non-executive royalty interests in the estate, that duty is not grounded in the special-relationship doctrine. The duty long predates the modern special-relationship doctrine (which is focused on insurance relationships). *See Manges v. Guerra*, 673 S.W.2d 180, 183 (Tex. 1984) (noting that the executive rights-holder's duty stems from *Schlittler v. Smith,* 101 S.W.2d 543, 545 (Tex. 1937)). Some cases refer to the holder of executive rights as a formal fiduciary. *E.g.*, *Luecke v. Wallace*, 951 S.W.2d 267, 274 (Tex. App.—Austin 1997, no pet.). Others cite Justice Spears's concurrence and describe the duty in terms of the special-relationship doctrine. *E.g.*, *Manges*, 673 S.W.2d at 183–84.

Recently, however, the Texas Supreme Court acknowledged the lack of clarity generated by the *Manges* decision's reliance on special-relationship-doctrine concepts and set things on a clearer footing; the court concluded that an executive rights-holder owes an intermediate sort of duty that extends beyond ordinary good faith and fair dealing but does not encompass the full bundle of duties incumbent on a formal fiduciary. *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79–82 (Tex. 2015). The upshot is that the duty of good faith and fair dealing in the oil-and-gas context is *sui generis* and has no bearing on the special-relationship doctrine as elaborated in this opinion. Thus, Justice Spears' concurring opinion in *English* does not establish that the special-relationship doctrine has been used to impose a duty of good faith and fair dealing on any non-insurance relationship.

escorted him to SMU's mental-health facility.  Second, Hux notes that he met with various individuals in the chaplain's office "on more than one occasion," where he "confided in numerous SMU personnel."  Third, Hux points to his meetings with Behrens and Webb, in which both administrators expressed a desire to help him and evinced concern about his well-being.  In sum, says Hux, those facts demonstrate that SMU personnel encouraged him to confide in them, to seek their guidance and direction, and to trust and rely on them.

Hux's appeal fails for at least two independent reasons.  First, given the Texas courts' decades-long refusal to extend the special-relationship doctrine beyond the insurance context, we are confident that the Texas Supreme Court would hold that there is no duty of good faith and fair dealing in the student-university relationship.  No Texas court has ever extended the doctrine to that relationship.  And indeed, the closest case holds that there is nothing 'special' in an ordinary student-professor relationship in which a professor teaches, supervises, advises, and evaluates a student.  *See Ho*, 984 S.W.2d at 693.  We see no material distinction here.

Hux's allegations show nothing more than an ordinary student-administrator relationship.  Encouraging students to take advantage of university mental-health resources, counseling students, and offering help to students struggling through disciplinary problems are all workaday aspects of a college administrator's job.  Allowing Hux's claim to go forward on the ground that Texas's highest civil court has not rejected his specific claim would run afoul of our longstanding rule against front-running the state courts by adopting innovative theories of state law.  *See Rubinstein v. Collins*, 20 F.3d 160, 172 (5th Cir. 1994).

Second, even assuming *arguendo* that the student-university relationship could possibly give rise to a duty of good faith and fair dealing, Hux's

allegations are not sufficient to show that such a relationship existed. None of his theories demonstrate that his purported special relationship with SMU administrators existed before and independently of the immediate circumstances of the course of events that led to his dismissal as a CA. The only facts he points to occurred after the events giving rise to this suit were set in motion. But a court may impose a duty of good faith and fair dealing only when the special relationship predates and exists separately from the dispute at hand. *Faircloth*, 898 S.W.2d at 280.

Also, Hux's claims demonstrate at most the sort of unilateral, purely subjective sense of trust that Texas courts have determined is insufficient to convert an ordinary arm's-length relationship into a special or confidential relationship. *See Swanson*, 959 S.W.2d at 177. The mere fact that one party to a transaction trusts the other or believes that the other has his interests at heart does not create a special relationship. *Crim Truck*, 823 S.W.2d at 595. Hux's allegations, even if true, show nothing more than his own unilateral trust and belief in the administrators' beneficence.

The judgment of dismissal is AFFIRMED.